[No. B035004. Second Dist., Div. Three. Mar. 23, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
HECTOR MANUEL AGUILAR, Defendant and Appellant.

COUNSEL

Patricia L. Reber, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Edward T. Fogel, Jr., Assistant Attorney General, Mark Alan Hart and Frederick Grab, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**DANIELSON, J.**—Hector Manuel Aguilar appeals from the judgment entered following a jury trial that resulted in his conviction of the first degree murder (Pen. Code, § 187) of his girlfriend, Cecilia Chayra, and a finding that he personally used a deadly weapon in committing the offense (Pen. Code, § 12022, subd. (b)). He was sentenced to state prison for a term of 25 years to life, enhanced by 1 year pursuant to subdivision (b) of Penal Code section 12022. We affirm the judgment.

### CONTENTIONS

Appellant contends the trial court erred in (1) applying the provisions of Evidence Code section 795 to his testimony, (2) ruling he waived his

attorney-client privilege for purposes of trial, (3) ruling he waived his right against self-incrimination in connection with his statements to a hypnotist, which the prosecution was permitted to use for impeachment purposes, (4) permitting the prosecutor to exceed the scope of his direct testimony on cross-examination, (5) restricting expert defense testimony by disallowing evidence of appellant's statements to the experts, (6) admitting for impeachment purposes his pretrial statements made to a police officer on April 24, 1987, after appellant had exercised his right to remain silent, (7) failing to instruct the jury sua sponte in the language of former CALJIC No. 3.36 (Evidence of Mental Disease) (now see CALJIC No. 3.32), and (8) admitting in evidence a photograph of the victim taken while she was alive.

## FACTS

We view the evidence in the light most favorable to the judgment in accordance with the usual rule governing appellate review. (*People* v. *Barnes* (1986) 42 Cal.3d 284, 303 [228 Cal.Rptr. 228, 721 P.2d 110].)

The victim, Chayra, died in appellant's apartment between the hours of 9:15 p.m. and 10 p.m. on April 21, 1987. Her death was caused by multiple stab wounds to her neck. A 12-inch kitchen knife with a serrated blade, a box cutter, a stick and a baseball bat were found near her body, which was lying on the blood-soaked living room carpet.[1] A blood-soaked shirt and Levis were found in the bedroom closet. Bloodstains were found in the kitchen, in the bathroom and on the living room wall near the front door.

As appellant was arrested outside his parents' home a few hours after the killing, his father asked what he had done, and appellant responded, "Termine a Cecilia," which means "I finished Cecilia off."

At appellant's booking, blood was noted on his clothing and person. The stains were consistent with the victim's blood, but not with appellant's. He was not under the influence of alcohol or drugs.

Chayra planned to terminate her relationship with appellant on the night she was killed because she feared he might be dealing cocaine. Appellant, who used and sold cocaine, had become increasingly paranoid in the months preceding the killing, and feared that Chayra would turn him in to the police.

In his defense, appellant claimed he and Chayra had been experiencing difficulties with their relationship for several days prior to the evening of

---

[1] Appellant's explanation that he had been invited to play baseball, and planned to use the box cutter to remove worn tape from his bat handle, was corroborated by a message on his telephone answering machine from Richard Bardales, as well as Bardales's testimony at trial.

April 21, 1987, when they met at his apartment and he suggested they stop seeing each other. Twice Chayra asked, " 'What?' " and twice appellant repeated his statement. Then, stating in a loud voice, " 'You can't do that,' " Chayra attacked him, throwing him off balance so that he dropped to his knees, and grabbing his shirt as she slapped at him, angrily repeating, " 'You can't do that.' "

Eventually, appellant was knocked flat on his back with Chayra on top of him. They struggled for a while and then Chayra reached for a knife. Believing she was about to stab him, appellant grabbed the knife. Although he recalled hitting Chayra, and struggling with her for possession of the knife, appellant did not remember stabbing her. When she stopped struggling with him he saw all the blood, then remembered nothing else until he reached his parents' home.

Psychological experts appointed to examine appellant concluded he suffered from paranoid personality traits which could have been caused or exacerbated by his cocaine use, and would impair his judgment and cause him to overreact if he felt threatened.

DISCUSSION

*Evidence Code Section 795*

■ Because of appellant's difficulty in recalling the killing, one of the psychological experts appointed by the court caused him to be hypnotized. Appellant complains of the trial court's application of Evidence Code 795 to his testimony.

In *People* v. *Shirley* (1982) 31 Cal.3d 18 [181 Cal.Rptr. 243, 723 P.2d 1354], our Supreme Court held "that the testimony of a witness who has undergone hypnosis for the purpose of restoring his memory of the events in issue is inadmissible as to all matters relating to those events, from the time of the hypnotic session forward." (*Id.* at pp. 66-67.) The court excepted from this rule the testimony of a defendant, stating, "when it is the defendant himself—not merely a defense witness—who submits to pretrial hypnosis, the experience will not render his testimony inadmissible if he elects to take the stand. In that case, the rule we adopt herein is subject to a necessary exception to avoid impairing the fundamental right of an accused to testify in his own behalf. (*People* v. *Robles* (1970) 2 Cal.3d 205, 214-215 . . . .)" (*People* v. *Shirley, supra,* 31 Cal.3d 18, 67.)

In June 1982, Proposition 8 amended the California Constitution to provide that, with certain specified exceptions, all relevant evidence is admissible. (Cal. Const. art I, § 28.)

In 1984, effective January 1, 1985, the Legislature enacted Evidence Code section 795, providing: "(a) The testimony of a witness is not inadmissible in a criminal proceeding by reason of the fact that the witness has previously undergone hypnosis for the purpose of recalling events which are the subject of the witness' testimony, if all of the following conditions are met:

"(1) The testimony is limited to those matters which the witness recalled and related prior to the hypnosis.

"(2) The substance of the prehypnotic memory was preserved in written, audiotape, or videotape form prior to the hypnosis.

"(3) The hypnosis was conducted in accordance with all of the following procedures:

"(A) A written record was made prior to hypnosis documenting the subject's description of the event, and information which was provided to the hypnotist concerning the subject matter of the hypnosis.

"(B) The subject gave informed consent to the hypnosis.

"(C) The hypnosis session, including the pre- and post-hypnosis interviews, was videotape recorded for subsequent review.

"(D) The hypnosis was performed by a licensed medical doctor or psychologist experienced in the use of hypnosis and independent of and not in the presence of law enforcement, the prosecution, or the defense.[2]

"(4) Prior to admission of the testimony, the court holds a hearing pursuant to Section 402 of the Evidence Code at which the proponent of the evidence proves by clear and convincing evidence that the hypnosis did not so affect the witness as to render the witness' prehypnosis recollection unreliable or to substantially impair the ability to cross-examine the witness concerning the witness' prehypnosis recollection. At the hearing, each side shall have the right to present expert testimony and to cross-examine witnesses.

"(b) Nothing in this section shall be construed to limit the ability of a party to attack the credibility of a witness who has undergone hypnosis, or to limit other legal grounds to admit or exclude the testimony of that witness."

---

2 Subdivision (a)(3)(D) was amended in 1987 to add licensed clinical social workers, and licensed marriage, family and child counselors certified in hypnosis by the Board of Behavioral Science Examiners, to the list of persons authorized to perform the hypnosis.

In *People* v. *Burroughs* (1987) 188 Cal.App.3d 1162 [233 Cal.Rptr. 872], the court discussed the legislative history of section 795: " 'STAFF COMMENTS: . . . . The purpose of the bill is to clarify the law as to when a witness may testify after having been hypnotized before trial. If the *Shirley* rule is followed, the witness may never testify. If Proposition 8 wholly overrules *Shirley,* a witness could testify in all cases after having been hypnotized. This bill would provide a middle ground and permit a witness to testify after having been hypnotized only if strict guidelines had been followed which would insure an adequate record upon which to judge whether hypnosis improperly contaminates the witness.' (Assem. Com. on Criminal Law and Public Safety, Analysis of Assem. Bill No. 2669 (1983-1984 Reg. Sess.) in original form.)

"The Legislature acted, declaring a previously hypnotized witness was not completely barred from testifying, at least to certain subjects when such testimony would be surrounded by several procedural safeguards. . . . The Legislature sought to ensure the integrity of the factfinding process, not to prescribe appropriate procedures for law enforcement authorities. The Legislature rejected the absolute bar to testimony of a previously hypnotized witness; it also clearly rejected the potential 'anything goes' of Proposition 8 if *Shirley* were overruled.

"As noted in the Senate Committee on Judiciary Analysis, '[t]his middle ground approach would put California in accord with the rules in nine other states . . . .' (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 2669 (1983-1984 Reg. Sess.) as amended June 20, 1984.) The bill's aim was to bring California in line with those jurisdictions from whose cases Justice Kaus fashioned his pre-*Shirley* exception in *Guerra* [*People* v. *Guerra* (1984) 37 Cal.3d 385 (208 Cal.Rptr. 162, 690 P.2d 635)]."[3] (*People* v. *Burroughs, supra,* 188 Cal.App.3d 1162, 1168-1169.)

In the present case, as related above, appellant did testify in his own behalf. He complains of the trial court's application of section 795 insofar as it resulted in discovery by the prosecution of assertedly privileged matter disclosed in his sessions with the hypnotist. Appellant argues that even assuming application of section 795, the court should have conducted an in camera hearing to determine the reliability of his posthypnosis testimony.

*Shirley* established that a defendant's submission to pretrial hypnosis will not render his testimony inadmissible. Proposition 8 did not affect this

---

[3] In his concurring opinion in *People* v. *Guerra, supra*, 37 Cal.3d 385, Justice Kaus, joined by Justice Grodin, emphasized that "virtually all of the other states that have adopted a 'per se' rule excluding hypnotically induced testimony, have at the same time expressly declared that a witness is not necessarily barred from testifying to events which the witness recalled and related to others before undergoing hypnosis. [Citations.]" (*Id.* at p. 431, italics omitted.)

holding as it enlarged, rather than diminished, the scope of admissible evidence. By its terms, Evidence Code section 795 imposes limits on the *admissibility* of posthypnosis testimony. Unless and until our Supreme Court modifies its holding in *Shirley,* that decision controls admissibility of the posthypnosis testimony of a defendant in this state. The trial court erred in ruling the statute applicable to appellant's testimony.

This does not end our inquiry in the present case where, although the trial court found the hypnotist did not meet the requirements of subdivision (a)(3)(D) of Evidence Code section 795, appellant was not thereby precluded from testifying. Rather, the court ruled the prosecution, after viewing tapes of the sessions relating to hypnosis, would have to show that "the prosecution has been prejudiced or the witness has been so programmed that the noncompliance with the Evidence Code will fatally infect the validity of [appellant's] testimony."

After viewing the tapes, the prosecutor was satisfied that the hypnosis did not affect the reliability of appellant's testimony. He was therefore permitted to testify in his own behalf. As heretofore stated, his complaint on this appeal is that because of the court's ruling on section 795, the prosecutor was permitted to discover the content of all of his statements to the hypnotist, and to thereafter use some of them to impeach him.

*Waiver of the Attorney-client Privilege*

■ At the hearing on admissibility of appellant's posthypnosis testimony, he personally waived his right of "confidentiality" with respect to his interviews with the hypnotist, Kurt Jorgensen, and agreed the prosecutor could review videotapes of those interviews. When the hearing continued at a later date, defense counsel stated that in light of the court's ruling that Evidence Code section 795 did apply, she had advised appellant to consent to the prosecutor's viewing of the tapes. She stated, "but I just want to make it clear they are turned over for that purpose only, that we do not concede that the prosecution has a right to discovery of any statements made by the defendant to a witness—I mean to an expert who has been appointed under the attorney/client privilege." She sought a ruling "that the prosecution use the information in those tapes solely for the purpose of [the 402] hearing, so if she wants to call an expert or cross-examine Mr. Jorgensen about the process and methodology of the hypnosis, that that be done; but if ultimately the court were to rule that [appellant] can testify, that she not be able to use his statements for impeachment purposes."

The prosecutor argued (assuming inadmissibility of any posthypnosis statements) appellant's prehypnosis statements to Jorgensen were admissi-

ble for impeachment purposes. The court so ruled, stating there were no restrictions on appellant's waiver and that inasmuch as he "subjected himself to this procedure under 795," his statements could be used to impeach him.

Defense counsel reiterated twice more that appellant's waiver was not intended for purposes of prosecutorial discovery, and requested that the tapes be sealed because they were within the attorney/client privilege. When the court again ruled the content of the tapes available for impeachment purposes, counsel moved pursuant to Evidence Code section 352 to exclude appellant's statements to Jorgensen that he had been followed by Drug Enforcement Administration (D.E.A.) agents and testified in a grand jury proceeding regarding the murder of an agent. The court ruled that inasmuch as the substance of appellant's statements had already been placed before the jury through testimony of other witnesses, their prejudicial effect in this context did not outweigh their probative value. The court did, however, promise to instruct the jury they were not to infer from the statements that appellant was involved in any misconduct.

Based on information gleaned from appellant's statements to the hypnotist, the prosecutor elicited appellant's testimony on cross-examination that he had been photographing cars on the freeway when he was stopped by a police officer, who explained that he had interrupted an ongoing investigation. As a result of this incident, appellant testified before a federal grand jury investigating the murder of a D.E.A. agent. In addition, federal prosecutors intimated to appellant that they thought he was a cocaine dealer. With respect to this testimony, the court admonished the jury: "As far as the jury is concerned, this evidence relates to a collateral matter to this trial and has nothing to do with the murder of a D.E.A. agent or federal proceedings; and the jury is specifically instructed that Mr. Aguilar is not a party to any federal action, he is not a suspect or a defendant in any other action. [¶] This matter is simply being brought up as a part of the overall pattern of conduct in this case and for that limited purpose. So, you are not to attach any significance to the fact he was called as a witness before a United States grand jury."

Appellant's waiver of the privilege against disclosure of his interviews with the hypnotist was occasioned by the trial court's erroneous application of Evidence Code 795 to his testimony. The waiver was not only limited to the hearing on admissibility of his posthypnosis testimony (Evid. Code, § 402); it was also not freely and voluntarily made. However, all that resulted from the prosecutor's discovery of the tapes was disclosure of the above-described incident, and the prosecutor's asking appellant several times on cross-examination if he remembered making certain statements to

the hypnotist. None of this evidence conflicted with appellant's testimony on direct examination.

Appellant argues the information gleaned by the prosecutor from his privileged statements to the hypnotist assisted in establishing the prosecution's theory of the case, i.e., that appellant was a drug dealer who killed his girlfriend because he feared she would turn him in to the police. Assuming this evidence initially possessed the probative value assigned it by appellant,[4] it was merely cumulative to other testimony concerning appellant's participation in drug transactions. In addition, we must presume the jury abided by the court's admonition that the incident related by the hypnotist had nothing to do with either this case or the murder being investigated by the officer who stopped appellant, and that appellant was neither a defendant nor a suspect in any federal action. The probative value, if any, of the complained of testimony was eliminated by this admonition, which also cured any prejudicial effect the testimony might otherwise have had. The error was harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

*Privilege Against Self-incrimination and Sixth Amendment Right to Counsel*

■ For the first time on this appeal, appellant claims disclosure of the tapes violated his privilege against self-incrimination and his Sixth Amendment right to counsel at all critical stages of the criminal process. Again, the resulting evidence was cumulative to other testimony, particularly that of Diana Heber, and any prejudicial effect it may otherwise have had was effectively precluded by the court's admonition to the jury. Again, the error was harmless. (*Chapman* v. *California, supra*, 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711].)

*Restrictions on Expert Defense Testimony*

■ Appellant complains of the court's refusal to permit his expert witnesses to relate his statements to them.

"A witness testifying in the form of an opinion may state on direct examination the reasons for his opinion and the matter . . . upon which it is based . . . ." (Evid. Code, § 802.)

---

[4] The complained of testimony, which was uncorroborated by the police officer or federal officials, was equally subject to interpretation as further evidence of appellant's paranoid personality traits.

The court permitted Dr. Goodman to testify to information he received from appellant's family members concerning his behavior during the period preceding the killing, for the purpose of establishing the basis for the expert's opinion. When defense counsel sought to elicit from the doctor appellant's statements to him concerning the killing itself, assertedly for the same purpose, the prosecutor's objection was sustained.

Dr. Coburn was also asked to relate appellant's statements to him concerning the killing. When the admissibility of this testimony was challenged, counsel argued that if the People were to be permitted to argue that appellant's testimony was affected by hypnosis,[5] then appellant should be able to show his prehypnosis statements to the doctor were consistent with his testimony at trial. Again, the prosecutor's hearsay objection was sustained.

The record discloses that Dr. Goodman ultimately testified his opinion was based essentially on his testing of appellant and the statements of appellant's family members, and "very little on what [appellant] said." Although Dr. Coburn stated he considered appellant's statements, including his perception of the situation during the stabbing incident, his diagnosis was based upon family information and test results provided by Dr. Goodman, as well as statements made by appellant's brother to police officers. The experts agreed appellant's mental condition was not apparent in their interviews with him. Thus, his statements to the experts were not matters upon which their opinions were based, and were not admissible pursuant to Evidence Code section 802, *supra*.

Insofar as appellant sought to admit the statements in anticipation of an attempt by the prosecutor to impeach his trial testimony by showing that it was affected by hypnosis, no such showing was ever made. ■ ■ ■ ■ Finally, the proffered evidence was not admissible as a statement of appellant's state of mind, emotion, or physical sensation at the time of the killing, as he was not unavailable as a witness. (Evid. Code, § 1251.)[6]

## Admission of Appellant's Statements to a Police Officer

■ Appellant complains of the trial court's admission for impeachment purposes of his statements to a police officer who questioned him after he

---

[5] The prosecutor stated she knew of no basis for such an argument.

[6] The privilege of a defendant in a criminal case not to become a witness does not make him unavailable. As a party, he is in a position to control his availability. (See Cal. Law Revision Com. com., Evid. Code, § 240: "Moreover, if the out-of-court statement is that of the party himself, he may not create 'unavailability' under this section by invoking a privilege not to testify"; see also, *People* v. *Cruz* (1968) 264 Cal.App.2d 350, 356-357, fn. 6 [70 Cal.Rptr. 603].)

had asserted his right to remain silent (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]). In *People* v. *May* (1988) 44 Cal.3d 309 [243 Cal.Rptr. 369, 748 P.2d 307], our Supreme Court held that Proposition 8 (Cal. Const, art I, § 28, subd.(d)) abrogated the rule of *People* v. *Disbrow* (1976) 16 Cal.3d 101 [127 Cal.Rptr. 360, 545 P.2d 272], precluding any use of such statements, and that any case arising after February 1, 1988, would be governed by the federal rule permitting their use for impeachment purposes. Appellant claims application of this rule to his statements made on April 24, 1987, prior to the *May* decision, constituted an ex post facto use of the *May* rule.

Appellant's focus on the decision in *May* is misplaced. The *Disbrow* rule was abrogated by the passage of article I, section 28, subdivision (d) of the California Constitution, effective June 9, 1982, prior to the events herein. (*People* v. *May, supra,* 44 Cal.3d 309, 318.) Section 28, subdivision (d) applies to prosecutions for crimes committed on or after its effective date (*People* v. *Smith* (1983) 34 Cal.3d 251, 262 [193 Cal.Rptr. 692, 667 P.2d 149]), and provides: "Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding, including pretrial and post conviction motions and hearings, or in any trial or hearing of a juvenile for a criminal offense . . . . Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay, or Evidence Code, Sections 352, 782 or 1103. Nothing in this section shall affect any existing statutory or constitutional right of the press."

As the court stated in *May*: "Given the probable aim of the voters in adopting section 28(d), namely, to dispense with exclusionary rules derived solely from the state Constitution, it is not reasonably likely that the California voters intended to preserve, in the form of a 'statutory' privilege, a judicially created exclusionary rule *expressly rejected* by the United States Supreme Court under the federal Constitution." (*People* v. *May, supra,* 44 Cal.3d 318, italics in original.)

Under federal law, statements elicited from a defendant in violation of his constitutional rights may be used for impeachment purposes. (*Harris* v. *New York* (1971) 401 U.S. 222, 225-226 [28 L.Ed.2d 1, 4-5, 91 S.Ct. 643]; *People* v. *Kimble* (1988) 201 Cal.App.3d 726, 731 [248 Cal.Rptr. 41].) From and after passage of section 28, subdivision (d), such statements may also be used for impeachment purposes in this state.

*CALJIC No. 3.36*

■ Appellant contends the trial court had a sua sponte duty to instruct in the language of former CALJIC No. 3.36 (now see CALJIC No. 3.32):

"Evidence has been received regarding a [mental disease] [mental defect] or [mental disorder] of the defendant [_____]. You may consider such evidence solely for the purpose of determining whether or not the defendant [_____] actually formed the mental state which is an element of the crime charged [in Count _____, to-wit _____ ."

Respondent contends "none of the expert testimony presented in the instant case raises even the slightest suggestion that appellant did not possess the necessary mental state, i.e., wilful deliberate premeditation, at the time of the murder."

Psychologist Dr. Alan Goodman found paranoid personality traits which, he explained, could cause "undue expectation of trickery or harm." Persons suffering with this condition "might question the loyalty of people that they have been friendly with. They might be very intent—quick, rather, to be aroused in anger, question the fidelity of people who have been formerly close, be hypervigilant to the environment around them, expecting harm or some kind of threat to come from what . . . they had normally related to with calmness[,] from people or situations where they had felt no harm, now they . . . would be looking for harm or trickery." According to Dr. Goodman, people with paranoid personality disorders are more easily insulted or slighted than others would be.

Psychiatrist Dr. Michael Coburn also found paranoid personality traits aggravated by cocaine use. Asked what effect these traits would have in an altercation situation, Dr. Coburn responded "it is very likely to lead to overreaction, to excessive action, to inappropriate action, to impaired judgment. [¶] There is a very great propensity to misinterpret behavior in a negative sense." He described a heightening of responses, and more rapid responses, especially in situations perceived as threatening.

In his own testimony, appellant claimed Chayra attacked him and was reaching for a knife just prior to the killing. The testimony of his experts was that a person subject to his mental condition would have more heightened and more rapid responses to perceived wrongs to himself. This evidence was offered for the purpose of raising a question whether appellant premeditated and deliberated, or even harbored malice aforethought, at the time of the killing. We agree with appellant that the court erred in failing to instruct on its own motion pursuant to CALJIC No. 3.36. (*People* v. *Leever* (1985) 173 Cal.App.3d 853, 865-866 [219 Cal.Rptr. 581] (criticized on another point in *People* v. *Ellis* (1987) 195 Cal.App.3d 334, 340-341 [240 Cal.Rptr. 708]).)

Here, as in *Leever, supra*, we are persuaded no miscarriage of justice resulted from the error. Appellant conceded he was the perpetrator of the homicide; the only issue was the degree of his culpability. The instructions given the jury fully illuminated his theory of the case, i.e., that he was guilty only of voluntary manslaughter, because the mental state described by the experts caused him to honestly but unreasonably believe in the necessity to defend himself. They were fully instructed on the offenses of first and second degree murder, as well as voluntary manslaughter. These instructions included definitions of malice aforethought, willful, deliberate, and premeditated. (CALJIC Nos. 8.11, 8.20.) The jury was instructed that one who kills upon a sudden quarrel or heat of passion, or in the honest but unreasonable belief in the necessity to defend himself against imminent peril to his life or great bodily injury, is guilty only of voluntary manslaughter. (CALJIC Nos. 8.40, 8.42, 8.44, 5.17.) They were instructed on the use of circumstantial evidence and the necessary concurrence of act and intent. (CALJIC Nos. 2.02, 3.31.) They were told the specific intent with which the act was done "may be shown by the circumstances surrounding the commission of the act," that the proven circumstances must be consistent with the theory that appellant had the required specific intent and irreconcilable with any other rational conclusion, and that any reasonable interpretation of the evidence pointing to the absence of specific intent must be adopted. (CALJIC No. 2.02.)

Contrary to appellant's assertion, the diminished responsibility defense was not removed from the jury's consideration, as was the case in *People v. Henderson* (1963) 60 Cal.2d 482, 491-494 [35 Cal.Rptr. 77, 386 P.2d 677]. In our case, counsel for appellant premised her entire argument on the effect of his mental condition upon his culpability for the homicide, urging the jury to convict him of voluntary manslaughter, rather than murder, because he honestly but unreasonably believed in the necessity to defend himself. As the court stated in *Leever*: "There can be no doubt under the circumstances that the jurors knew the legal significance of the evidence of mental condition." (*People v. Leever, supra,* 173 Cal.App.3d 853, 866.) The factual question posed by the omitted instruction was necessarily resolved adversely to appellant under other, properly given instructions. (*People v. Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913] (disapproved on another point in *People v. Flannel* (1979) 25 Cal.3d 668, 684-685, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1]); *People v. Stewart* (1976) 16 Cal.3d 133, 141 [127 Cal.Rptr. 117, 544 P.2d 1317].)

*The Victim's Photograph*

Appellant claims he was prejudiced by the jury's viewing of a photograph of the victim taken while she was alive. Any error in admitting the photo-

graph was harmless. (*People* v. *Hendricks* (1987) 43 Cal.3d 584, 594 [238 Cal.Rptr. 66, 737 P.2d 1350].)

## DECISION

The judgment is affirmed.

Klein, P. J., and Arabian, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 21, 1990. Arabian, J., did not participate therein.