125 F.3d 815
 97 Cal. Daily Op. Serv. 7518, 97 Daily Journal
D.A.R. 12,124
Hector Manuel AGUILAR, Petitioner-Appellant,
v.
Annie ALEXANDER, Acting Warden; Attorney General of the
State of California, Respondents-Appellees.
 No. 96-55688.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 6, 1997.
Decided Sept. 22, 1997.
 
 Janet I. Levine, Michaelson & Levine, Los Angeles, CA, for petitioner-appellant.
 Paul C. Ament, Deputy Attorney General, Los Angeles, CA, for respondents-appellees.
 Appeal from the United States District Court for the Central District of California; William D. Keller, District Judge, Presiding. D.C. No. CV-95-01525-WDK(JR).
 Before: BOOCHEVER, KOZINSKI and JOHN T. NOONAN, Jr., Circuit Judges.
 BOOCHEVER, Circuit Judge.
 
 
 1
 Hector Manuel Aguilar appeals the district court's denial of his petition for habeas corpus, alleging that his counsel at his state murder trial provided ineffective assistance.
 
 FACTS
 
 2
 Hector Manuel Aguilar was convicted of first-degree murder by a jury in California state court for killing his girlfriend, Cecilia Chayra. This account of the facts found by the state court appears in People v. Aguilar, 218 Cal.App.3d 1556, 267 Cal.Rptr. 879, 880-81 (1990).
 
 
 3
 The victim, Chayra, died in appellant's apartment between the hours of 9:15 p.m. and 10:00 p.m. on April 21, 1987. Her death was caused by multiple stab wounds to her neck. A 12-inch kitchen knife with a serrated blade, a box cutter, a stick and a baseball bat were found near her body, which was lying on the blood-soaked living room carpet.1 A blood-soaked shirt and Levis were found in the bedroom closet. Blood stains were found in the kitchen, in the bathroom and on the living room wall near the front door.
 
 
 4
 As appellant was arrested outside his parents' home a few hours after the killing, his father asked what he had done, and appellant responded, "Termine a Cecilia," which means "I finished Cecilia off."
 
 
 5
 At appellant's booking, blood was noted on his clothing and person. The stains were consistent with the victim's blood, but not with appellant's. He was not under the influence of alcohol or drugs.
 
 
 6
 Chayra planned to terminate her relationship with appellant on the night she was killed because she feared he might be dealing cocaine. Appellant, who used and sold cocaine, had become increasingly paranoid in the months preceding the killing, and feared that Chayra would turn him in to the police.
 
 
 7
 In his defense, appellant claimed he and Chayra had been experiencing difficulties with their relationship for several days prior to the evening of April 21, 1987, when they met at his apartment and he suggested they stop seeing each other. Twice Chayra asked, "What?" and twice appellant repeated his statement. Then, stating in a loud voice, "You can't do that," Chayra attacked him, throwing him off balance so that he dropped to his knees, and grabbing his shirt as she slapped at him, angrily repeating, "You can't do that."
 
 
 8
 Eventually, appellant was knocked flat on his back with Chayra on top of him. They struggled for a while and then Chayra reached for a knife. Believing she was about to stab him, appellant grabbed the knife. Although he recalled hitting Chayra, and struggling with her for possession of the knife, appellant did not remember stabbing her. When she stopped struggling with him he saw all the blood, then remembered nothing else until he reached his parents' home.
 
 
 9
 Psychological experts appointed to examine appellant concluded he suffered from paranoid personality traits which could have been caused or exacerbated by his cocaine use, and would impair his judgment and cause him to overreact if he felt threatened.
 
 
 10
 At trial, Aguilar admitted to the killing. The major issue was whether he was guilty of first degree murder, second degree murder, or manslaughter. A jury found him guilty of first degree murder, with an enhancement for the use of a deadly weapon. The state court sentenced him to prison for 25 years to life. The state appeal court affirmed his conviction in People v. Aguilar, supra, and the California Supreme Court denied the petition for review.
 
 
 11
 Aguilar filed a petition for a writ of habeas corpus in California Superior Court, including a claim that his attorney was ineffective. All levels of the state court system denied the petition.
 
 
 12
 Having exhausted his state court ineffective assistance claim, Aguilar filed a habeas petition in federal district court. The district court denied the petition. Aguilar appeals, arguing that his trial counsel provided ineffective assistance.
 
 DISCUSSION
 
 13
 To show ineffective assistance of counsel, [the defendant] must show that counsel made errors so serious that [she] was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment, and that the deficient performance prejudiced the defense. There is a strong presumption that counsel's performance f[ell] within the wide range of professional assistance.
 
 
 14
 Tomlin v. Myers, 30 F.3d 1235, 1237 (9th Cir.1994) (citations omitted). This court reviews a claim of ineffective assistance de novo. Id. The decision whether to grant or deny a petition for habeas corpus is also subject to de novo review. Crotts v. Smith, 73 F.3d 861, 864 (9th Cir.1996). Aguilar claims that his trial counsel made three unprofessional and prejudicial errors: she urged him to waive his attorney-client privilege to videotapes of hypnosis sessions without first reviewing the videotapes herself; she advanced a defense theory that his cocaine use had made him paranoid; and she did not aggressively pursue plea negotiations with the prosecutor.
 
 I. Videotapes of hypnosis sessions
 
 15
 In California before the end of 1984, a witness who had undergone hypnosis to restore memory could not subsequently testify "as to all matters relating to those events, from the time of the hypnotic session forward." People v. Shirley, 31 Cal.3d 18, 181 Cal.Rptr. 243, 273, 723 P.2d 1354, 1384 (1982). This rule did not apply to a defendant who planned to testify, "to avoid impairing the fundamental right of an accused to testify in his own behalf." Id.
 
 
 16
 In June 1982, the California constitution was amended to provide that all relevant evidence was admissible. Cal. Const. art. I, § 28. California Evidence Code section 795, effective January 1, 1985, clarified the status of testimony following hypnosis, providing that a witness could testify after hypnosis if a series of conditions were met, including that "[t]he hypnosis was performed by a licensed medical doctor or psychologist experienced in the use of hypnosis." Cal. Evid.Code § 795(a)(3)(D). This was the state of California law at the time of Aguilar's trial.
 
 
 17
 Because Aguilar had little memory of the events surrounding Chayra's death, a court-appointed psychiatrist suggested Aguilar undergo hypnosis to enhance his recollection. Defense counsel arranged for Aguilar to participate in twelve two-hour sessions, which were videotaped for a total of twenty-four hours of videotape.
 
 
 18
 The prosecution learned of the videotaped sessions after it had called its witnesses. The judge held a hearing outside the jury's presence to determine whether Aguilar could testify, given his hypnosis. Aguilar's attorney argued that the California statute applied only to witnesses other than defendants, citing Shirley. The trial court, however, found that the statute applied to Aguilar, and that the hypnotist used did not satisfy the requirements of Cal Evid.Code § 795(a)(3)(D).
 
 
 19
 Nevertheless, the court did not automatically bar Aguilar's testimony. Instead, it ruled that to block his testimony the prosecution, after viewing the videotapes, would have to show "the prosecution has been prejudiced or the witness has been so programmed that the noncompliance with the Evidence Code will fatally infect the validity of [Aguilar's] testimony." In light of this ruling, Aguilar's counsel advised him to waive his attorney-client privilege and consent to the viewing of the tapes "for that purpose only ... we do not concede that the prosecution has a right to discovery of any statements made by the defendant to an ... expert who has been appointed under the attorney/client privilege." Aguilar, 267 Cal.Rptr. at 883. At the time that she advised him to waive the privilege, Aguilar's counsel had not viewed the tapes, except the single tape describing the actual stabbing incident. [Red Br. p. 11 n. 7]
 
 
 20
 Aguilar's counsel sought a ruling that information derived from the tapes could not be used to impeach Aguilar, but the judge ruled it could be so used. Aguilar's counsel again objected, and the court again ruled that the tapes could be used to impeach Aguilar. Counsel then moved to exclude statements from the videotapes regarding Aguilar's encounter with DEA agents and his testimony in a grand jury proceeding regarding the murder of a DEA agent. The court ruled that the statements were admissible, but promised to instruct the jury that they could not infer misconduct based on the statements.
 
 
 21
 After viewing the tapes, the prosecutor decided not to object to Aguilar's testifying. When Aguilar did take the stand, however, the prosecutor in cross-examination used information from the videotaped statements Aguilar had made to the hypnotist. The prosecutor questioned Aguilar about his testimony as a third-party witness before a federal grand jury investigating the killing of two DEA agents. The prosecutor also questioned Aguilar about an interview with two Justice Department attorneys who allegedly had accused Aguilar of dealing cocaine.
 
 
 22
 The court admonished the jury that this evidence related to a collateral matter, and that Aguilar was not and had not been a suspect or defendant in any federal action. "This matter is simply being brought up as a part of the overall pattern of conduct in this case and for that limited purpose. So, you are not to attach any significance to the fact he was called as a witness before a United States grand jury." Id. at 884.
 
 
 23
 On this habeas appeal, Aguilar argues that his counsel was ineffective in counseling him to waive his attorney-client privilege as to the videotaped hypnosis sessions. Not only was it professionally incompetent for her to do so without viewing the tapes, he argues, but he was prejudiced because the prosecution used the evidence from the tapes to establish that as a drug dealer he premeditated Chayra's killing to silence her, making him guilty of first-degree murder.
 
 A. Deficient performance
 
 24
 As the California Court of Appeal noted, the state court erred in holding that the statute could preclude Aguilar, the defendant, from testifying at his own trial. Id. at 883. That error resulted in his waiver of privilege concerning the tapes, the prosecution's discovery of incriminating statements, and the use of those statements in his subsequent impeachment. Id.
 
 
 25
 It is a close call whether counsel acted "outside the wide range of professional assistance." First, the waiver "was ... limited to the hearing on admissibility of his post-hypnotic testimony." Id. at 884. When she initially advised Aguilar to waive the privilege, counsel reasonably could expect that the information on the videotapes would not be used other than at that hearing. Second, counsel's interpretation of the statute was correct. Aguilar, as a defendant, was exempt from the provisions of § 795 limiting testimony by hypnotized witnesses. Because the judge misinterpreted the statute, believing that it applied to defendants who testified on their own behalf, he suggested that the government review the tapes to determine whether the hypnosis would prevent Aguilar from testifying. That action forced the issue of waiver on Aguilar.
 
 
 26
 Further, the state court had directed that it would decide whether Aguilar could testify only after the government viewed the tapes. Presumably, if Aguilar refused to waive the privilege as to the tapes, the court would have ruled that he could not testify, as there would be no way of determining whether the hypnosis had so "programmed" Aguilar as to make his testimony invalid. Because Aguilar's counsel risked losing his testimony if she did not advise him to consent to the waiver, the government argues that her actions can be construed as a tactical choice, and not ineffective assistance. Crotts, 73 F.3d at 866 n. 4. (counsel's conduct not ineffective assistance if it can be construed as the result of a tactical decision).
 
 
 27
 Finally, the prosecution's case for a first-degree murder conviction was strong. To show premeditation and deliberation, the prosecution presented testimony that Aguilar suspected that Chayra would turn him in to the police; Chayra had intended to break up with Aguilar, and her coldness the day of the murder had worried him; and the physical evidence showed an extended struggle, supporting an intent to kill rather than brief violence in the heat of passion. Aguilar also was able to present an innocent explanation for the presence of his baseball bat and box cutter near Chayra's body. Aguilar's testimony was thus needed to present a different version of events and establish a lesser degree of culpability.
 
 
 28
 Counsel was faced with a Hobson's choice: waive the privilege or lose the opportunity of having Aguilar testify. To the extent that counsel urged the waiver to preserve Aguilar's opportunity to testify, that decision constituted a trial strategy and not deficient performance.
 
 
 29
 We cannot ignore, however, that Aguilar's counsel apparently did not herself, or have others, review more than one of the twelve two-hour tapes. It surely was her professional duty to know the contents of the tapes before counselling Aguilar to waive his privilege. Her failure to do so casts doubt on whether she made a tactical decision. Allowing the prosecution to view twenty-two hours of videotape of her client's hypnosis, without knowing what the tapes contained, cannot easily be characterized as informed trial strategy.
 
 
 30
 It would have been far preferable for counsel to request that she be given time to screen the tapes. We need not decide, however, whether her failure to view them was deficient performance, because even if it was, Aguilar has not demonstrated that the error prejudiced him.
 
 B. Prejudice
 
 31
 To show prejudice, Aguilar must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984).
 
 
 32
 Aguilar argues that if the evidence of his peripheral involvement in the DEA murder investigation and of federal officials' inquiry regarding his cocaine dealing had not been introduced during cross-examination, there is a reasonable probability that he would have been convicted of second-degree murder or manslaughter rather than first degree murder. We disagree.
 
 
 33
 The prosecution, Aguilar states, used the evidence to establish that as a drug dealer, he had the motive to kill Chayra to silence a potential witness. We disagree. The government introduced considerable evidence from sources other than the tapes to establish Aguilar's involvement with cocaine and his motivation for murder. There was evidence that Chayra wanted to break up with Aguilar because of his involvement with cocaine, and that Aguilar thought that Chayra was going to turn him in; Aguilar had discussed cocaine sales with his brother, and weighed and packaged a large quantity of cocaine for sale; Aguilar had discussed "snitches" and believed that someone who was following him, as well as Chayra, was going to turn him in to the police. Aguilar admitted he had procured drugs for friends. [CR 22 p. 56] The evidence derived from the tapes thus was largely cumulative, especially given that other evidence tended to show that Aguilar feared "snitches" in general and Chayra in particular. [CR 22 p. 6] This was relevant to the prosecution's theory that silencing Chayra was a motive for a premeditated killing.
 
 
 34
 Second, the trial court gave the jury a limiting instruction not to attach any significance to Aguilar's testimony before the grand jury, and instructed the jury that the intimations by federal prosecutors that Aguilar was involved in drug dealing "are not admitted for the truth of the matter." [Red Br. p. 14] Juries are presumed to follow the court's instructions. Richardson v. Marsh, 481 U.S. 200, 211, 107 S.Ct. 1702, 1709, 95 L.Ed.2d 176 (1987). There are some extreme situations in which curative instructions will not neutralize the prejudice when evidence is improperly admitted. See, e.g., United States v. Bland, 908 F.2d 471, 473 (9th Cir.1990) (court's comments that defendant on firearms charge was child molester and killer cannot be cured by instruction); United States v. Gillespie, 852 F.2d 475, 479 (9th Cir.1988) (same for testimony that defendant on charge of child molestation had homosexual relationship with adopted father). This was not such an extreme situation.
 
 
 35
 Aguilar has not demonstrated prejudice from his counsel's advice to waive his privilege and allow the prosecutor to view the videotapes.
 
 II. Counsel's defense strategy
 
 36
 Aguilar's counsel argued at trial that Aguilar, who had been using cocaine on weekends for five or six years, had thus exacerbated his paranoid tendencies, testified to by two expert witnesses. The defense theory was that as a result of his drug use Aguilar honestly but unreasonably believed that he needed to defend himself against Chayra and so was guilty only of manslaughter.
 
 
 37
 Under California law, if a defendant kills with an honestly held but unreasonable belief that he needs to defend himself, he is not guilty of malice and can be convicted only of voluntary manslaughter. People v. Flannel, 25 Cal.3d 668, 160 Cal.Rptr. 84, 90, 603 P.2d 1, 7 (1979) (as modified). Aguilar claims that his counsel was deficient in arguing that this theory applied to him, because it is not available to a defendant who is voluntarily intoxicated.
 
 
 38
 Aguilar is wrong on two counts. First, counsel never argued-and the evidence negated-that Aguilar was under the influence of drugs at the time of the killing. Second, imperfect self-defense is available to an intoxicated defendant, so even if the voluntariness of Aguilar's drug use is relevant, it did not preclude the defense. See People v. Cameron, 30 Cal.App.4th 591, 36 Cal.Rptr.2d 656, 661 (1994). The defense theory was not legally in error.
 
 
 39
 Aguilar also argues that the defense advanced by his counsel prejudiced him by emphasizing his cocaine use. Yet his use of illegal drugs was already established by evidence introduced by the prosecution, and his counsel's use of his habit was an attempt to turn that evidence to his advantage. Counsel's strategic choice did not constitute error, and in any event Aguilar has shown no prejudice.
 
 III. Failing to conduct plea negotiations
 
 40
 Finally, Aguilar argues that his attorney should have been more aggressive in pursuing plea negotiations with the prosecutor, and that her failure to do so prejudiced him.
 
 
 41
 Aguilar's counsel submitted a declaration stating that she and Aguilar had discussed the possibility of a plea bargain, perhaps for voluntary manslaughter. The state prosecutor's office, however, would not make any offers. Although Aguilar's counsel initiated plea negotiations with the prosecutor, the prosecutor refused to offer anything less than first-degree murder. [Red Br. p. 21]
 
 
 42
 Aguilar emphasizes the importance of plea bargaining and submits that failure to seek a plea bargain is evidence of incompetence. In this case, however, Aguilar's counsel stated that she did seek a plea bargain but was rebuffed. Aguilar apparently believes that his trial counsel should have tried harder, submitting a declaration from his attorney on appeal that in his experience it is rare that one attempt results in a plea disposition, and that it is "customary" for defense attorneys to continue to press for negotiations. [ER pp. 65-66]
 
 
 43
 These "shoulds" and "customary" practices do not rise to the level of showing that Aguilar's counsel's performance was deficient. Instead, they are differences in the strategy, tactics, and styles of defense attorneys. If Aguilar's counsel had advised him to plead guilty without attempting to obtain a plea to something less than first-degree murder, that might be below the standard of reasonable performance. See Hawkman v. Parratt, 661 F.2d 1161, 1171 (8th Cir.1981). In this case, counsel sought plea negotiations, was rejected, and proceeded to trial, where she argued that her client was not guilty of first-degree murder. No error occurred.
 
 
 44
 AFFIRMED.
 
 
 45
 ---------------
 
 
 
 1 Appellant's explanation that he had been invited to play baseball, and planned to use the box cutter to remove worn tape from his bat handle, was corroborated by a message on his telephone answering machine from Richard Bardales, as well as Bardales' testimony at trial.