UNITED STATES of America, Appellee,

v.

James Louis SURRIDGE, Appellant.

No. 82–1033.

United States Court of Appeals,
Eighth Circuit.

Submitted May 20, 1982.

Decided Aug. 30, 1982.

Rehearing Denied Sept. 23, 1982.

Certiorari Denied Nov. 29, 1982.
See 103 S.Ct. 465.

---

Christopher Thomas, Little Rock, Ark., for appellant.

George W. Proctor, U. S. Atty., Kenneth F. Stoll, Asst. U. S. Atty., Little Rock, Ark., for appellee.

Before BRIGHT, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and ARNOLD, Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge.

James Louis Surridge appeals his conviction at a bench trial for bank robbery with the use of a dangerous weapon in violation of 18 U.S.C. § 2113(d) (1976). The basis of his appeal is that the district court [1] erred in denying his motion to suppress evidence obtained in consequence of a statement he made to a friend while Surridge was in police custody.

## I.  Facts

On Wednesday, August 19, 1981, a bank in Pottsville, Arkansas, was robbed by two individuals wearing blue overalls. The two were chased but escaped into a wooded area. On Friday morning, August 21, a police officer from the Pope County Sheriff's Department saw Surridge walking along the highway and stopped him because of his similarity to one of the bank robbery suspects. The officer asked Surridge where he had been and where he was going. Surridge's inconsistent answers and his similarity to one of the bank robbery suspects aroused the officer's suspicion. The officer suggested that they go to the Pope County Courthouse in Russellville, Arkansas, and Surridge complied with the request. The officer had not asked about the bank robbery, had not placed Surridge under arrest, had not read *Miranda* rights to Surridge, and had not told him he did not have to go to the courthouse.

An FBI agent met Surridge at the courthouse and told Surridge he wanted to interview him about the bank robbery. He presented Surridge with a waiver of rights form. Surridge said he did not want to answer questions without an attorney, and that he would call a friend to get the attorney. He then called a friend, Dan Spencer, who was living with him at the time. Surridge asked Spencer to come to Russellville. Surridge then requested that he be taken to his truck. An FBI agent and the sheriff took Surridge to his pickup truck, which was in a wooded area. Surridge's co-de-

1. The Honorable G. Thomas Eisele, Chief Judge, United States District Court, Eastern District of Arkansas.

fendant was in the cab of the truck, in which also was located a weapon. Other physical evidence, including an automatic weapon, overalls, and gloves, was obtained from the scene. At this point the FBI agent told Surridge and his co-defendant they were under arrest. They were returned to the Pope County Courthouse and jailed.

The next day, Saturday, August 22, Spencer called the sheriff and asked if he could visit Surridge. The sheriff said Spencer could visit Surridge on Sunday, August 23. During the course of Spencer's conversation with the sheriff, Spencer said he might be able to find out the location of the stolen money. On Sunday Spencer went to the courthouse, where an officer took him to Surridge. Spencer and Surridge met shortly before visiting hours in a conference room in the courthouse. They were given coffee and doughnuts. Without Spencer's knowledge, the police attempted to tape-record the meeting, but the tape was inaudible. After Spencer left the meeting with Surridge, he related to the sheriff what Surridge had told him. Using Spencer's information, the police found the money in a farm pond.

Surridge argued before the district court that evidence of his conversation with Spencer should have been suppressed because Spencer was acting as a government agent and therefore his meeting with Surridge violated Surridge's privilege against self-incrimination, his right to counsel, and his right to due process. The district court held a suppression hearing to determine whether Surridge's meeting with Spencer was the functional equivalent of an interrogation. After hearing the evidence, the district court found that the police had offered nothing of value to Spencer before the meeting for his information, they had not made a deal with Spencer, they had done nothing to direct or control the interview, and Spencer had volunteered the idea of acquiring the information. The court

held that under these circumstances Spencer could not be considered an agent of the police, and the motion to suppress was denied. After a bench trial, Surridge was convicted and sentenced to eighteen years in prison.

## II. Standard of Review

First we must determine the standard of review of the district court's findings. As a general proposition, we will accept a district court's findings of fact unless clearly erroneous, *United States v. Williams*, 604 F.2d 1102, 1121 (8th Cir. 1979), and we make an independent review of legal conclusions. In the instant case it is important to distinguish between the factual issues and the legal issues. Some courts have called the determination of whether a person is a government informant or agent a factual determination. *United States v. Malik*, 680 F.2d 1162, 1165 (7th Cir. 1982); *United States v. Van Scoy*, 654 F.2d 257, 261 (3d Cir.), *cert. denied*, 454 U.S. 1126, 102 S.Ct. 977, 71 L.Ed.2d 114 (1981). We agree that the determination as to the relationship or understanding between the police and the informant[2] is a factual determination. However, beyond this factual determination there is a legal question: whether the relationship or understanding as found by the district court is such that the informant's questioning has to be considered government interrogation for constitutional examination. *See Malik*, 680 F.2d at 1165.

■ The factual determinations in this case are that the police made no offer to Spencer, no deal was struck between Spencer and the police, Spencer had no previous relationship with the police, Spencer received no payment or benefit for his information, the police made no attempt to direct or control the interview, and the police knew Spencer would probably attempt to obtain incriminating information from Surridge. Applying our usual standard of review of factual determinations, we find more than enough evidence in the record to say that the district court's findings are not

---

**2.** In some contexts the word "informant" implies a relationship between the individual and the police. The use of that word in this opinion

does not suggest any conclusion as to the existence of such a relationship.

clearly erroneous.[3] The legal question which remains is whether, under the facts of this case, Surridge's fourth, fifth, or sixth amendment rights were violated.

## III. Right to Counsel

Surridge argues that the meeting between him and Spencer violated his right to counsel under the sixth amendment[4] and his right to counsel as a component of the privilege against self-incrimination under the fifth amendment.[5]

### A. Basis of the Right to Counsel

The Supreme Court has found the right to counsel implicit in the fifth amendment as well as by the terms of the sixth amendment. In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that the fifth amendment guarantees an accused the right to have counsel present during custodial interrogation. *Id.* at 469–70, 86 S.Ct. at 1625. The rationale was essentially that in-custody interrogation contains inherently compelling pressures which work to undermine the individual's will to resist and compel him to speak when he would not otherwise do so freely. *Id.* at 467, 86 S.Ct. at 1624. The Court has recently stated that the fifth amendment right to counsel means: "[A]n accused ..., having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884, 68 L.Ed.2d 378 (1981). *See also Stumes v. Solem*, 671 F.2d 1150 (8th Cir. 1982), *petition for cert. filed*, 50 U.S.L.W. 3949 (U.S. Apr. 30, 1982) (No. 81–2149.)

Surridge's sixth amendment claim is based on *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), which held that the government violated the defendant's sixth amendment right to counsel by intentionally creating a situation likely to induce the defendant to make incriminating statements without the assistance of counsel. *Id.* at 274, 100 S.Ct. at 2189. *See also Massiah v. United States*, 377 U.S. 201, 206, 84 S.Ct. 1199, 1203, 12 L.Ed.2d 246 (1964).

### B. Analysis

■ The sixth amendment does not apply in this case because the sixth amendment right to counsel does not attach until adversarial judicial proceedings have been initiated, *Kirby v. Illinois*, 406 U.S. 682, 688–89, 92 S.Ct. 1877, 1881–82, 32 L.Ed.2d 411 (1972), and the record does not show that any such proceedings had been initiated at the time of Surridge's meeting with Spencer. It is unclear whether the rights found in *Henry* and *Massiah* could be based on the fifth amendment as well as the sixth amendment. *Massiah* suggested that the fifth amendment was implicated in that case, 377 U.S. at 204, 84 S.Ct. at 1201, *id.* at 209, 84 S.Ct. at 1264 (White, J., dissenting), but the Court relied on the sixth amendment. *Id.* at 205–06, 84 S.Ct. at 1202–03. Because *Henry* is the Supreme Court case most factually similar to the one at bar, we will assume arguendo that the rights delineated in *Henry* would apply, through the fifth amendment, to an inmate against whom adversarial judicial proceedings had not been initiated.

The fifth amendment restrains government action, so the relevant inquiry is the extent of the government involvement. Here there are two aspects of the government involvement. The first is the police's

---

**3.** The Pope County Sheriff and Spencer were consistent and uncontradicted in testifying that there was no discussion of any deal before the meeting, and the police gave no benefit to Spencer. At the suppression hearing the district court barred witnesses from the courtroom except when they were testifying.

**4.** The sixth amendment reads, in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence."

**5.** The fifth amendment reads, in pertinent part: "No person ... shall be compelled in any criminal case to be a witness against himself ...."

relationship with Spencer. As found by the district court, the police made no arrangements with Spencer; the extent of their involvement with him is that they were aware that he was going to try to obtain incriminating information from Surridge. The other aspect of the government involvement is that the police created the setting for Spencer's meeting with Surridge. The setting for this meeting differed from the setting for normal meetings between prisoners and friends in that doughnuts were provided and the meeting took place half an hour before normal visiting hours.

This government involvement was clearly less than the government involvement in *Henry*. In *Henry*, government agents contacted an inmate at the jail where Henry was awaiting trial for a bank robbery. The inmate had been an FBI informant in the past. The record did not make clear whether the inmate was contacted for the purpose of acquiring information about Henry. During the course of the contact, the government agent told the inmate to be alert to statements made by other prisoners, but not to initiate conversations with Henry about the robbery. The inmate later provided the agent with information which incriminated Henry, and was paid. In determining that the informant's statements were inadmissible as a violation of Henry's right to counsel, the Court characterized the issue as whether a government agent "deliberately elicited" incriminating statements from Henry. 447 U.S. at 270, 100 S.Ct. at 2187. The Court noted three important factors: (1) the inmate was acting under instructions as a paid informant for the government, (2) the inmate was ostensibly no more than a fellow inmate of Henry's, and (3) Henry was in custody when he made the statements. *Id.*

First we note that the three "important factors" listed by the Court in *Henry* were not set out as a litmus test. Nevertheless, they are helpful in evaluating the government's involvement. The third factor, custody of the defendant, is clearly present.

The second factor, the informant being a fellow inmate, is not present. However, we cannot see a constitutionally significant difference between an inmate and Spencer, who was a friend and who talked with Surridge at the jail.

The first factor, however, is not present. Unlike the informant in *Henry*, Spencer was not acting under instructions from the government, nor did he receive any payment from the government. Surridge argues that Spencer was "paid" because he might receive a reward, sell his business product (leather goods) to the police, or acquire possession of Surridge's truck. The police were unaware of Spencer's business and his interest in Surridge's truck, and there was no mention of the reward before Spencer's meeting with Surridge. Also, the reward was offered by a bankers' association, not the police.[6]

By mentioning these items as possible sources of payment, Surridge shows he misses the significance of the payment in *Henry*. As mentioned before, the key issue is the extent of government involvement. When the government pays an informant, it is evidence (although not conclusive) that a prior agreement between the government and the informant existed, whether that agreement was explicit or implicit. In the instant case, the police did nothing after the meeting to give a benefit to Spencer which would have evidenced an implicit agreement between Spencer and the police.

Other circuits have rejected previous attempts to extend *Henry*. In *Malik* the Seventh Circuit held that *Henry* does not apply to an inmate who acquired information from the defendant, even though the inmate had previously been a paid informant for the government, because the inmate's relationship with the government had been broken off before the information was acquired. 680 F.2d at 1165. Similarly, the Third Circuit in *Van Scoy* held that an inmate who was previously an informant for the government was not an informant at the time he acquired the incriminating

---

6. The record does not show whether Spencer sought or received a reward.

information from the defendant. 654 F.2d at 260–61.

Like *Henry*, *Edwards* does not control the outcome of this case. If Surridge were to apply *Edwards* to the instant case,[7] he would argue that the police violated *Edwards* by allowing Surridge to be interrogated without counsel and without his initiation of the interrogation; although Surridge initiated the conversation with Spencer, he did not think he was initiating a conversation with the police. *Edwards* does not directly apply because in *Edwards* the interrogation was performed by police officers.

The instant case is not directly controlled by *Henry* or *Edwards*. Furthermore, there was not sufficient involvement by the police to implicate the concerns of those cases. Here, the findings of fact show that Spencer was not acting on behalf of the police or by their direction any more than if he had never told the police of his intention to find out where the money was hidden. In light of the district court's findings, we cannot call Spencer an "agent" of the police in any usual sense of the word.

The only part of the meeting that was different as a result of Spencer's conversation with the police was the setting, that is, the provision of doughnuts and the meeting taking place half an hour before regular visiting hours.[8] It is conceivable that in some situations the setting would have a significant effect on the interrogation; in such a case, creation by the police of an unusual setting might be enough government involvement to trigger application of the fifth and sixth amendments. Such a problem could arise if the police put a "truth serum" in the coffee or perhaps even if they served alcohol instead of coffee. In the instant case, the setting may have helped make Surridge feel relaxed. But we cannot say that doughnuts, provided in a meeting that takes place half an hour before visiting hours, "can operate very quickly to overbear the will" of the accused, the concern of *Miranda*. 384 U.S. at 469, 86 S.Ct. at 1625.

Surridge appears to be suggesting that *Henry*, *Edwards*, or the general concerns of the fifth and sixth amendments create an affirmative duty on the part of the police to prevent a private citizen from acquiring information from a person in custody and giving it to the police. The Seventh Circuit held that potential informants who were inmates need not be segregated from the general prison population simply because of their status as potential informants. *Malik*, 680 F.2d at 1165. Likewise, we do not think the police have a duty to bar visits with potential informants; indeed such a requirement would be unfair to prisoners. Also, when a person offers to assist the police, we do not think the police must try to stop the person from providing assistance. As long as the police do nothing to direct or control or involve themselves in the questioning of a person in custody by a private citizen, such questioning does not violate the fifth or sixth amendments.

## IV. Fourth Amendment

Surridge also argues that the meeting with Spencer was an unlawful search or seizure of his oral statements in violation of the fourth amendment.[9] Surridge did not raise this argument in the district court and therefore we need not decide it here. *United States v. Librach*, 536 F.2d 1228, 1231

---

**7.** Surridge's counsel did not discuss *Edwards* in his brief.

**8.** The conversation was taped, but it was inaudible and led to no incriminating evidence. The police did not tell Spencer they were going to tape the conversation, but he said he suspected they did because of the unusual circumstance of their providing coffee and doughnuts. Spencer's testimony indicated that this belief made him more willing to tell the police about his conversation with Surridge.

**9.** The fourth amendment reads: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized."

(8th Cir.), *cert. denied*, 429 U.S. 939, 97 S.Ct. 354, 50 L.Ed.2d 308 (1976). Nevertheless, we note that the extent of a pretrial detainee's fourth amendment rights while in jail is not settled. We have stated that prisoners retain some fourth amendment rights in jail, which are limited by institutional security needs and the prisoner's reduced expectation of privacy. *United States v. Stumes*, 549 F.2d 831, 832 (8th Cir. 1977). Courts have held that even if some expectation of privacy exists in jail, searches can be reasonable if they are necessary for an institution's legitimate security interests. *Bell v. Wolfish*, 441 U.S. 520, 556–60, 99 S.Ct. 1861, 1883–85, 60 L.Ed.2d 447 (1979); *United States v. Hearst*, 563 F.2d 1331, 1345–46 (9th Cir. 1977) (monitoring and recording of prisoner-visitor conversations were reasonable and not violative of the fourth amendment), *cert. denied*, 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978). The question remains whether pretrial detainees have fourth amendment rights which restrict the government's power to make investigatory or other non-security searches or seizures. *See Bell*, 441 U.S. at 556–57, 99 S.Ct. at 1883. As noted in *Bell, id.*:

> It may well be argued that a person confined in a detention facility has no reasonable expectation of privacy with respect to his room or cell and that therefore the Fourth Amendment provides no protection for such a person. Cf. *Lanza v. New York*, 370 U.S. 139, 143–144 [82 S.Ct. 1218, 1220–21, 8 L.Ed.2d 384] (1962). In any case, given the realities of institutional confinement, any reasonable expectation of privacy that a detainee retained necessarily would be of a diminished scope. *Id.*, at 143 [82 S.Ct. at 1220.]

In an earlier analysis, the Supreme Court in *Lanza v. New York*, 370 U.S. 139, 143, 82 S.Ct. 1218, 1221, 8 L.Ed.2d 384 (1962), stated:

> [W]ithout attempting either to define or to predict the ultimate scope of Fourth Amendment protection, it is obvious that

a jail shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room. In prison, official surveillance has traditionally been the order of the day. [Footnote omitted.]

One court, however, has found a search of a pretrial detainee's letters in his jail cell a violation of the fourth amendment, noting that the search did not advance legitimate security interests. *United States v. Hinckley*, 672 F.2d 115, 130–31 (D.C.Cir.1982). Of course, the fourth amendment is only implicated when there is government involvement. As we stated above in the discussion of the right to counsel, there was no government involvement in this case.[10]

## V. Conclusion

There was substantial evidence to support the district court's conclusion that Spencer and the police had not made a deal and that the police did not direct or control Spencer's actions. Surridge would have us extend *Henry* and *Edwards* to require the police to take affirmative steps to prevent a private citizen from questioning an accused when the police know that the individual intends to acquire information which would be helpful to the police. While it is clear that the constitutional limitations are implicated when a private citizen becomes an agent of the police, we do not think the constitution requires affirmative action to prevent citizen assistance. When a citizen offers a helping hand to law enforcement officials, it need not be refused. We therefore affirm the judgment of the district court.

---

10. There was not an issue as to the constitutionality of taping the conversation between Spencer and Surridge because it was inaudible and therefore did not contribute to the prosecution's case.