George Thomas FRANKLIN, Plaintiff,

v.

Jim FOX, et al., Defendants.

No. C 97–2443 CRB.

United States District Court,
N.D. California.

July 17, 2000.

Deborah Penny Bennett, County Counsel's Office—San Mateo County, Hall of Justice & Records, Redwood City, CA,

James M. Wagstaffe, Kerr & Wagstaffe, San Francisco, CA, for Robert Morse, Bryan Cassandro, Martin Murry, John Cuneo, defendants.

Richard S. Diestel, Bledsoe Cathcart Diestel Livingston & Pedersen, San Francisco, CA, for Eilenn Franklin–Lipsker, defendant.

Dennis P. Riordan, Riordan & Rosenthal, San Francisco, CA, Andrew C. Schwartz, Casper Meadows & Schwartz, Walnut Creek, CA, for plaintiffs.

## MEMORANDUM AND ORDER

BREYER, District Judge.

Now before the Court are (1) the motion for summary judgment of defendants Robert Morse and Bryan Cassandro, (2) the motion for summary judgment of defendants Martin Murray and John Cuneo, (3) the motion for summary judgment of plaintiff Eileen Franklin–Lipsker, and (4) plaintiff's cross-motion for summary judgment with respect to the Murray/Cuneo motion. After carefully considering the papers filed by the parties, including their evidentiary objections, and having had the benefit of oral argument, defendants' motions for summary judgment are GRANTED and plaintiff's cross-motion for summary judgment is DENIED.

## BACKGROUND

This action arises from the 1990 conviction of plaintiff for first-degree murder after a jury trial in San Mateo County. Plaintiff was convicted of the 20–year–old murder of his daughter's friend, Susan Nason, based, in part, on his daughter's recovered memory. In 1995, this Court (Honorable D. Lowell Jensen), granted plaintiff's petition for habeas corpus on the ground that there were several constitutional errors at trial and that the errors were not harmless. *Franklin v. Duncan,* 884 F.Supp. 1435 (N.D.Cal.), *aff'd,* 70 F.3d 75 (9th Cir.1995). Plaintiff has not been retried and in 1996 the San Mateo County District Attorney dismissed the charges

against plaintiff and, according to the complaint before this Court, announced that he did not have sufficient evidence to convict plaintiff.

Plaintiff subsequently filed this civil rights section 1983 action against the prosecution's expert witness, Lenore Terr; his daughter's therapist, Kirk Barrett; the Assistant District Attorney who assisted at trial, Martin Murray; the trial attorney, Elaine Tipton, the District Attorney James Fox; and three detectives.

By Order filed April 30, 1998, the Court dismissed the claims against Terr and Barrett on the ground that the claims are barred by defendants' absolute witness immunity. The Court also dismissed the third, fourth and fifth causes of action against the San Mateo defendants, the second cause of action as to defendants Morse and Cassandro, and the first cause of action as to defendant Murray. Plaintiff filed an interlocutory appeal of the Court's dismissal of the claims against Terr and Barrett. The Ninth Circuit affirmed. *Franklin v. Terr,* 201 F.3d 1098 (9th Cir. 2000). Plaintiff subsequently dismissed defendant Fox.

The only claims remaining in this action are the first cause of action against defendants Morse and Cassandro, the second cause of action against defendants Murray and Cuneo, and all of the claims against Franklin–Lipsker. In the first cause of action plaintiff alleges that defendants Morse and Cassandro arrested plaintiff without probable cause and that they conspired with Franklin–Lipsker to do so. In the second cause of action plaintiff alleges that defendants Murray and Cuneo conspired with Franklin–Lipsker to have Franklin–Lipsker interrogate plaintiff without his attorney present in violation of his Sixth Amendment rights.

All remaining defendants now move for summary judgment. Defendants Morse, Cassandro, Murray and Cuneo contend that they are entitled to qualified immunity. Franklin–Lipsker asserts that she is entitled to summary judgment based on absolute witness immunity and because

plaintiff has not produced evidence sufficient to permit a reasonable trier of fact to find that she conspired with the defendants.

## DISCUSSION

## I. THE QUALIFIED IMMUNITY MOTIONS

Under the doctrine of qualified immunity, government officials performing discretionary functions are shielded from liability for civil damages if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "The relevant question ... is the objective (albeit fact-specific) question whether a reasonable officer could have believed [the challenge actions] lawful, in light of clearly established law and the information the [defendants] possessed." *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

■ Accordingly, "[d]etermining whether a public official is entitled to qualified immunity 'requires a two-part inquiry: (1) Was the law governing the state official's conduct clearly established? (2) Under that law could a reasonable state official believe his conduct lawful?'" *Liston v. County of Riverside,* 120 F.3d 965, 975 (9th Cir.1997) (citation omitted). "'A public official is not entitled to qualified immunity when the contours of the allegedly violated right were sufficiently clear that a reasonable official would understand that what he [was] doing violate[d] that right.'" *Id.* (citations omitted); *see also Anderson,* 483 U.S. at 640, 107 S.Ct. 3034 (A public official is shielded qualified immunity unless the "contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right").

The question of whether a reasonable officer could have believed his conduct was lawful is "'essentially a legal question' ...

that should be determined by the district at the earliest possible point in the litigation." *Act Up P!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir.1993) (quoting *Forsyth*, 472 U.S. at 526, 105 S.Ct. 2806). "Where the underlying facts are undisputed, a district court must determine the issue on motion for summary judgment." *Id.* If, however, "a genuine issue of fact exists preventing a determination of qualified immunity at summary judgment, the case must proceed to trial." *Id.; Liston*, 120 F.3d at 965.

### A. First Cause of Action: Morse and Cassandro

The first cause of action alleges that defendants Morse and Cassandro arrested plaintiff without probable cause to believe that he committed the murder of Susan Nason. The qualified immunity issue in this context is "whether 'a reasonable officer could have believed that probable cause existed to arrest' the plaintiff." *Mendocino Environmental Center v. Mendocino County*, 14 F.3d 457, 462 (9th Cir. 1994). "[T]he principle focus in an unlawful arrest case is one the objective reasonableness of the officer's probable cause determination." *Id.* "The determination of whether the facts alleged could support a reasonable belief in the existence of probable cause ... is ... a question of law to be determined by the court." *Act Up!/Portland*, 988 F.2d at 873. .

Defendants arrested plaintiff without a warrant for the murder of Susan Nason on November 28, 1989. The arrest was preceded by a series of unsolicited telephone calls Franklin–Lipsker made to the San Mateo District Attorney's Office earlier that month. In those calls, Franklin–Lipsker advised defendants that she had witnessed her father (the plaintiff) murder her childhood friend, Susan Nason, 20 years earlier. She was initially reluctant to talk, and the first telephone calls were made by her then-husband Barry Lipsker. Franklin–Lipsker told the District Attorneys Office that at the time of the murder (when she was eight), her father threatened that he would kill her if she reported

anything. After Franklin–Lipsker made the first of her calls, defendant Morse became the lead investigator on the case and became a party to many of the subsequent telephone conversations. On November 25, 1989, Morse and defendant Cassandro met with Franklin–Lipsker in person and found her to be a compelling witness. Three days later they arrested plaintiff.

At the time of the arrest, Morse and Cassandro were aware of other information which corroborated Franklin–Lipsker's story. First, Susan Nason, the deceased, was a friend of the Franklin family and knew the plaintiff and Franklin–Lipsker. Second, the plaintiff did not have an alibi for the time of the murder. Third, the "profile" of the murderer was a pedophile since there was no other motive for the murder and plaintiff fit that profile. Franklin–Lipsker and her sister Janice Franklin both had told defendants that plaintiff had sexually abused them and their older sister. Fourth, Janice Franklin also told defendants that around the time of the murder, when officers telephoned to speak to her about Susan Nason's murder, plaintiff kicked her in the back to indicate that she should not say anything. Fifth, Janice Franklin reported that she had seen the plaintiff "play" inappropriately with Susan Nason. Defendants based their decision to arrest based on these and other facts and contend that reasonable officers under the same circumstances could have believed there was probable cause to arrest.

Plaintiff argues that summary judgment must be denied because there are genuine issues of fact precluding the application of qualified immunity. The Ninth Circuit has explained that

> [w]here a Fourth Amendment violation is claimed, the factual issues that may preclude a determination of qualified immunity on summary judgment fall into two categories. First, a determination of reasonable suspicion or probable cause requires an inquiry as to the facts

and circumstances within an officer's knowledge. . . . These are matters of fact to be determined, where genuine disputes of a material nature exist, by the fact finder. . . . Second, the determination of what conduct underlies the alleged violation—what the officer and claimant did or failed to do—is a determination of fact.

*Act Up!/Portland,* 988 F.2d at 873. Plaintiff argues that there is a genuine dispute as to whether defendants knew that Franklin–Lipsker's memory of her father murdering Susan Nason was hypnotically induced. If they knew her memory was so induced, argues plaintiff, a reasonable officer would have known that he did not have probable cause to arrest.

### 1. California law as to hypnotically-induced testimony

In 1982 the California Supreme Court held "that the testimony of a witness who has undergone hypnosis for the purpose of restoring his memory of the events in issue is inadmissible as to all matters relating to those events, from the time of the hypnotic session forward." *People v. Shirley,* 31 Cal.3d 18, 66–67, 181 Cal.Rptr. 243, 723 P.2d 1354 (1982). "[E]vents in issue" are those that were " 'the subject of the hypnotic session.' " *People v. Hayes,* 49 Cal.3d 1260, 1269, 265 Cal.Rptr. 132, 783 P.2d 719 (1989) (quoting *Shirley,* 31 Cal.3d at 68, 181 Cal.Rptr. 243, 723 P.2d 1354). In 1984, the California legislature responded to *Shirley* by enacting Evidence Code section 795. *See People v. Aguilar,* 218 Cal.App.3d 1556, 1560–61, 267 Cal.Rptr. 879 (1990). Section 795 permits a witness who has been so hypnotized to testify, but only if strict guidelines have been followed. *Id.* at 1562, 267 Cal.Rptr. 879. In particular, "the testimony of a witness is not inadmissible in a criminal proceeding by reason of the fact that the witness has previously undergone hypnosis for the purpose of recalling events which are the subject of the witness' testimony" only if, among other things, the "testimony is limited to those matters which the witness recalled and related prior to the hypnosis,"

and "[t]he substance of the prehypnotic memory was preserved in written, audiotape, or videotape form prior to the hypnosis." Evidence Code § 795(a)(1) & (2). Thus, in 1989 the law in California was well-established that testimony about events that *were recalled during hypnosis* is inadmissible. Plaintiff accordingly argues that if Morse and Cassandro knew that Franklin–Lipsker's memory of the murder was recalled during hypnosis, they knew, or objectively should have known, that her eyewitness account of the murder was unreliable and inadmissible and could not provide a basis for probable cause to arrest.

### 2. Whether there is a genuine dispute as to whether Morse and Cassandro knew Franklin–Lipsker's memory was hypnotically induced

■ An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The issue for the Court is whether plaintiff has submitted evidence sufficient to permit a reasonable trier of fact to find that at the time Morse and Cassandro arrested plaintiff either of them knew Franklin–Lipsker's eyewitness account had been hypnotically induced and was therefore inadmissible.

As a preliminary matter, there is ample evidence in the record to support a finding that Franklin–Lipsker recovered her memory of the Nason murder while under hypnosis. At a hearing on January 14, 1996 in San Mateo Superior Court, Janice Franklin testified (after being granted immunity) that in August 1989 Franklin–Lipsker told her that "she had been hypnotized and had remembered this [the murder] through the help of hypnosis." Plaintiff's Opposition, Exh. A, p. 122. The issue on this motion, however, is not whether Franklin–Lipsker had been hypnotized, but whether either defendant

knew she had been hypnotized at the time they arrested plaintiff.

In the record before the Court all participants in the November 25, 1989 conversation in which Franklin–Lipsker allegedly told defendants she discussed her memory of the murder while under hypnosis deny that any such discussion took place. Franklin–Lipsker, Morse, and Cassandro each testify that Franklin–Lipsker told the officers that she had considered hypnosis for weight gain, but had not actually undergone hypnosis. This testimony is consistent with Assistant District Attorney Murray's testimony as to what Franklin–Lipsker told him.

Plaintiff nonetheless contends that Morse, Cassandro and Franklin–Lipsker are all lying. His evidence that defendants knew Franklin–Lipsker's memories were hypnotically induced and therefore unreliable and inadmissible is as follows:

Before Morse personally interviewed Franklin–Lipsker, Assistant District Attorney Murray told him that Franklin–Lipsker had recovered her memories of the Nason murder while in therapy. Declaration of James M. Wagstaffe ("Wagstaffe Decl."), Exh. R, at 2. Franklin–Lipsker also told Murray that she had discussed hypnosis for weight loss with her therapist, but had not undergoing hypnosis. While Murray does not have a specific memory of conveying that information to Morse, he testified that he had a long conversation with Morse about what to ask Franklin–Lipsker during Morse's interview with Franklin–Lipsker, and he assumes he discussed the hypnosis issue with Morse. Wagstaffe Decl., Exh. S, at 118–19. Moreover, Morse testified that Murray advised him that Franklin–Lipsker had received some information about hypnosis for weight loss. Wagstaffe Decl. Exh. P, at 128.

On November 25, 1989, Morse and Cassandro interviewed Franklin–Lipsker at her home. Defendants tape recorded the first hour of the interview. Wagstaffe Decl. Exh. G. After they turned-off the tape recorder, they asked Franklin–Lipsk-er two more questions. First, they asked whether plaintiff is left or right-handed. Second, they asked whether she had ever been hypnotized. Defendants and Franklin–Lipsker attest that Franklin–Lipsker responded that she had considered hypnosis for weight loss, but had never actually undergone hypnosis. Morse's notes from the unrecorded portion of the interview, however, read simply: "hypnosis for weight loss." Wagstaffe Decl., Exh. FF, Exh. B.

Plaintiff's evidence does not reasonably support an inference that Franklin–Lipsker told defendants that she had discussed her memory of the murder while under hypnosis. There is no evidence that Franklin–Lipsker told defendants that she had recalled her memories while under hypnosis, or that she had even discussed the murder while under hypnosis. To prove that defendants understood that Franklin–Lipsker's testimony was discussed while she was under hypnosis, and thus was unreliable and inadmissible, plaintiff needs something more than speculation that the opposite of all the testimony must be true. The fact that the tape recording device was "turned off" at the end of the interview, just before hypnosis was discussed, does not supply the "something more." If, as plaintiff implies, the reason the tape recorder was turned off was so that defendants would have no record of Franklin–Lipsker admitting to recovery of her memories under hypnosis, why would Morse have made the written notation "hypnosis for weight loss?" Again, to infer that this conduct was, in some manner, an act designed to hide the fact that defendants knew Franklin–Lipsker's testimony as to the murder was hypnotically induced is to engage in unwarranted speculation.

■ While plaintiff's evidence does not create a genuine dispute as to whether Franklin–Lipsker told defendants she had discussed her memory of the murder while under hypnosis, it does create a genuine dispute as to whether Morse understood

that Franklin–Lipsker was hypnotized for weight loss by the same therapist who assisted her in recovering her alleged memory of the murder. This dispute of fact, however, does not preclude summary judgment in favor of defendants.

As is explained above, at the time of plaintiff's arrest only those witnesses who had "undergone hypnosis for the purpose of restoring his memory of the events in issue" were disqualified from testifying. If defendants did not understand that Franklin–Lipsker had recovered her memories of the murder while under hypnosis, and instead understood only that she had undergone hypnosis for "weight loss," a reasonable officer in their position could have believed that Franklin–Lipsker's non-hypnotically induced memory of the murder was reliable and admissible. In other words, if a trier of fact found that Franklin–Lipsker told defendants that she had been hypnotized for weight loss—which is the most a reasonable trier of fact could find—defendants would be entitled to qualified immunity.

Moreover, to the extent plaintiff contends that defendants should have asked more follow-up questions after Franklin–Lipsker allegedly told them she had been hypnotized for weight loss, defendants are still entitled to qualified immunity. Plaintiff cannot and does not cite any case that places an obligation on an investigating officer to inquire as to whether a witness who admits to having been hypnotized for one purpose was also hypnotized while discussing the events at issue. In any event, it is mere speculation that Franklin–Lipsker would have admitted to defendants that her memories were hypnotically induced if specifically asked, especially since she continues to deny that she underwent hypnosis at all.

Finally, the fact that the evidence—and in particular, the notation "hypnosis for weight loss" in Morse's notes—supports an inference that Franklin–Lipsker told defendants she had been hypnotized for weight loss, and thus that defendants were lying when they testified that Franklin–Lipsker said only that she had considered, but not tried, hypnosis for weight loss, does not also support an inference that Franklin–Lipsker told defendants she discussed her memories of the murder while under hypnosis. Plaintiff has the burden of producing evidence sufficient to permit a trier of fact to find that defendants, or either of them, knew that Franklin–Lipsker had discussed the murder while under hypnosis. Plaintiff has not met that burden.

Since the Court has concluded that a reasonable trier of fact could not find that defendants understood that Franklin–Lipsker's memories of the murder had been hypnotically induced, or even discussed while she was under hypnosis, it need not decide whether defendants would be entitled to qualified immunity even if the evidence supported such an inference. In other words, it need not decide whether in 1989 a reasonable officer could have relied on such inadmissible evidence as a basis for probable cause. *See Gentry v. State,* 471 N.E.2d 263, 267 (Ind.1984) (holding that although hypnotically induced testimony may be inadmissible at trial, evidence obtained through hypnosis may serve as a basis for probable cause).

## 2. Other Arguments

Plaintiff makes additional arguments as to why there is a genuine dispute as to whether defendants reasonably could have believed they had probable cause to arrest him. None requires much discussion. Franklin–Lipsker's eyewitness account of the murder, together with the other corroborating evidence known to defendants, arguably created probable cause to arrest and thus entitles defendants to qualified immunity. The fact that Franklin–Lipsker's memory was inconsistent with some of the evidence known to defendants does not create a dispute as to whether defendants are entitled to qualified immunity. None of these inconsistencies about an event that happened when Franklin–Lipsker was eight years old—20 years earlier—is so

glaring as to eliminate *arguable* probable cause. Indeed, as defendants note, if Franklin–Lipsker had not had any inconsistencies in her memory that in and of itself would have been suspicious.

Similarly, the fact that Franklin–Lipsker did not report the crime for 20 years also does not negate *arguable* probable cause. Plaintiff has not established that at the time of the arrest the law was well-established that stale accusations are inadmissible, or more importantly, that they cannot form the basis for probable cause. Moreover, the probable cause hearing judge knew of the 20–year delay in Franklin–Lipsker's reporting of the crime, yet he found probable cause to proceed with the murder prosecution.

Finally, plaintiff contends there is a dispute as to whether defendants actually believed that Franklin–Lipsker knew details of the crime that were not publicly known. Morse's declaration in support of the search warrant for plaintiff's residence stated that he had read newspaper articles (plural) and that Franklin–Lipsker knew facts (and, in particular, a fact about a crushed ring) that were not publicly available. The undisputed evidence demonstrates, however, that the description of the crushed ring was included in several newspaper articles. Nonetheless, even assuming Morse knew that the details Franklin–Lipsker recounted were available in the public domain, a reasonable officer knowing what Morse knew could have believed that there was probable cause. First, it is undisputed that Franklin–Lipsker told defendants that she had not read any newspaper articles. The law does not require an arresting officer to disbelieve a witness. Second, even if Franklin–Lipsker did not know any "nonpublic" information, the other evidence at a minimum arguably creates probable cause entitling defendants to qualified immunity,

**B. Second Cause of Action: Murray and Cuneo**

The second cause of action alleges that Murray (the ADA) and Cuneo (a jail official) conspired to have Franklin–Lipsker interrogate her father without his attorney present in violation of his Sixth Amendment rights. Defendants contend that the undisputed facts prove that there was no Sixth Amendment violation, or in the alternative, that they are at least entitled to qualified immunity. Plaintiff has filed a cross-motion seeking an order that defendants violated his Sixth Amendment rights.

**1. The summary judgment record.**

Viewing the evidence in the light most favorable to the plaintiff, and assuming (without deciding) that all evidentiary disputes are resolved in plaintiff's favor, the Court concludes that a reasonable trier of fact could find the following facts:

a. In mid-December 1989, before plaintiff's probable-cause hearing, Franklin–Lipsker called ADA Murray and asked him if it would hurt the murder prosecution of her father if she talked to her father for the purpose of convincing him not to put the family through a trial and to plead guilty. Murray agreed that it would be better if Franklin pled guilty. Franklin–Lipsker also asked Murray what plaintiff would do if he wanted to admit the truth and plead guilty. Murray responded that he has a lawyer to talk to.

b. Murray also told Franklin–Lipsker that he could not ask her to visit his father, but that he didn't think it was such a bad idea.

c. During that same telephone conversation Franklin–Lipsker asked Murray to get her information on visiting hours at the jail and how she could arrange to visit plaintiff after visiting hours. Murray told her he would try to get the information. Murray subsequently called the jail and spoke to defendant Cuneo, the shift sergeant responsible for "anything out of the ordinary." Murray told Cuneo the hours that Franklin–Lipsker was available to visit and Cuneo told him to have Franklin–Lipsker call Cuneo to arrange the visit. Murray subsequently called Franklin–

Lipsker and gave her Cuneo's telephone number.

d. Franklin–Lipsker called Cuneo and arranged what Cuneo characterizes as a "special visit" for a specific date and time. Two weeks later, Franklin–Lipsker met with plaintiff at the jail without his lawyer present. Before plaintiff met with Franklin–Lipsker, a jail official told plaintiff that it was his daughter who wanted to visit with him.

e. Franklin–Lipsker met with Murray in Murray's office just prior to and just after her meeting with plaintiff. Murray testified that at the meeting before her visit he reiterated that he was not encouraging or discouraging her from going and that the visit had nothing to do with the District Attorney's office. She replied that she was making the visit on her own initiative. When Franklin–Lipsker returned to Murray's office after the visit Murray asked, "is he going to do it [plead]?"

The above evidence would permit a reasonable trier of fact to find that (1) Murray knew that Franklin–Lipsker was going to visit her father in order convince him to plead guilty, that is, to confess, (2) that he facilitated her visit by calling Cuneo and telling him to expect a call from Franklin–Lipsker and giving Franklin–Lipsker Cuneo's telephone number, and (3) that Murray met with Franklin–Lipsker just before and just after her visit with her father and that during those meetings she and Murray discussed her visit.[1]

Defendants contend that the facts presented in connection with this summary judgment motion are far different from those presented to the court in plaintiff's habeas corpus proceedings, and they urge the Court to conclude that based on the facts now before the Court no Sixth Amendment violation occurred. The

Court declines defendants' invitation. The record before the Court supports a finding of facts that are sufficiently similar to those presented to the court in *Franklin v. Duncan* such that controlling Ninth Circuit precedent compels the conclusion that a Sixth Amendment violation occurred.

2. Whether defendants are entitled to qualified immunity

■ Plaintiff argues that defendants are not entitled to summary judgment because at the time of defendants' actions the law was clearly established that the government could not interrogate a defendant represented by counsel through an agent, such as Franklin–Lipsker. As support for his argument, plaintiff cites *Franklin v. Duncan,* 884 F.Supp. 1435 (N.D.Cal.), *aff'd,* 70 F.3d 75 (9th Cir.1995), in which the court concluded that Franklin–Lipsker's jail house visit did in fact violate plaintiff's Sixth Amendment rights. He also cites the three United States Supreme Court cases relied upon by the *Franklin* court: *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), *Maine v. Moulton,* 474 U.S. 159, 176, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985), and *United States v. Henry,* 447 U.S. 264, 274, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980).

Plaintiff's argument fails because it focuses solely on the first part of the two-part qualified immunity analysis. "Determining whether a public official is entitled to qualified immunity 'requires a two-part inquiry: (1) Was the law governing the state official's conduct clearly established? (2) Under that law could a reasonable state official believe his conduct lawful?'" *Liston v. County of Riverside,* 120 F.3d 965, 975 (9th Cir.1997) (citation omitted). While the Sixth Amendment right not to

---

1. The Court notes that plaintiff's evidence does not support some of the allegations originally made in the complaint. In particular, the evidence does not support a finding that Murray told Cuneo that plaintiff should be brought into a visiting room that had recording equipment to ensure that any statement by Franklin would be taped or that Murray

"further instructed Cuneo that George Franklin was not to be told with whom he was to visit, because he then might exercise his right to counsel and refuse to meet with Franklin–Lipsker; rather, plaintiff was to be deceived into entering the visiting room." (First Amended Complaint ¶ 33).

be questioned without counsel was well-established, plaintiff fails to cite any case that demonstrates that the "contours of the right were sufficiently clear that a reasonable official" in defendants' situation would have understood that what they were doing violates that right. *Anderson*, 483 U.S. at 640, 107 S.Ct. 3034.

In *Maine v. Moulton*, for example, the Supreme Court held that the State violated the Sixth Amendment rights of a defendant when it arranged to record conversations between the defendant and a codefendant *who was operating as an undercover agent for State*. The codefendant had agreed to cooperate with the prosecution, and the State placed a wire on him so he could record a face-to face meeting between him and the defendant.

In *United States v. Henry*, the Court held that the defendant's incriminating statements made to paid informant who, while confined in the same cellblock as defendant, *had been told by government agents to be alert to any statements made by federal prisoners* but not to initiate conversations with or question defendant regarding the charges against him were inadmissible as being "deliberately elicited" from defendant in violation of his Sixth Amendment right to counsel.

From these cases a reasonable officer could conclude that the conduct at issue in this case violates the Sixth Amendment (as did the Ninth Circuit). A reasonable officer could also conclude, however, that since Murray (the government actor) did not initiate Franklin–Lipsker's visit, did not promise Franklin–Lipsker anything in return for her "cooperation," and did not tell Franklin–Lipsker to do anything in particular (other than to advise her as to who she should call to arrange the visit), the conduct did not violate the Sixth Amendment. Indeed, the court in *Franklin v. Duncan* explained how the facts of this case fall outside the clearly established "contours" of the Sixth Amendment:

> If the government directs an individual to elicit incriminating statements from a defendant, the sixth amendment is vio-

lated. If, by contrast, the state obtains incriminating statements "by luck or happenstance," . . . the sixth amendment is not violated. Thus, if Franklin–Lipsker had gone to speak to her father on her own and only afterwards told the state about it, there would be no violation of petitioner's Massiah rights. If, by contrast, the state had approached Franklin–Lipsker and asked her to obtain a confession, there would be a violation. *The actual facts of the case fall somewhere in between.* In the Court's judgment, though, the government's involvement in Franklin–Lipsker's visit to her father was sufficiently extensive as to constitute a Massiah violation.

*Franklin*, 884 F.Supp. at 1451 (emphasis added). The District Court and the Ninth Circuit concluded that Murray's conduct did in fact violate the Sixth Amendment. As the above passage demonstrates, however, a reasonable officer in Murray's position could have believed that his conduct was constitutional; that is, that the facts are closer to the "luck or happenstance" scenario than when the State initiates the interrogation.

The Eighth Circuit's decision in *United States v. Surridge*, 687 F.2d 250 (8th Cir. 1982), demonstrates why defendants are entitled to qualified immunity on the record before the Court. There the defendant's "friend," Spencer, telephoned the sheriff and asked if he could visit the defendant who was accused of bank robbery. The sheriff said Spencer could visit the defendant on Sunday, August 23. During the course of Spencer's conversation with the sheriff, Spencer said he might be able to find out the location of the stolen money. On the appointed Sunday, Spencer went to the courthouse, where an officer took him to the defendant. Spencer and the defendant met shortly before visiting hours in a conference room in the courthouse. They were given coffee and doughnuts. Without Spencer's knowledge, the police attempted to tape-record the meeting, but the tape

was inaudible. After Spencer left the meeting with the defendant, he related to the sheriff what the defendant had told him. Using Spencer's information, the police found the money in a farm pond. *Id.* at 251.

The defendant argued before the district court that evidence of his conversation with Spencer should have been suppressed because Spencer was acting as a government agent and therefore his meeting with defendant violated the defendant's privilege against self-incrimination, his right to counsel, and his right to due process. The district court held a suppression hearing to determine whether Surridge's meeting with Spencer was the functional equivalent of an interrogation. After hearing the evidence, the district court found that the police had offered nothing of value to Spencer before the meeting for his information, they had not made a deal with Spencer, they had done nothing to direct or control the interview, and Spencer had volunteered the idea of acquiring the information. The court held that under these circumstances Spencer could not be considered an agent of the police, and the motion to suppress was denied. *Id.*

The Eight Circuit affirmed. It held that Spencer was not a government agent because he was not acting under instructions from the government, did not receive any payment from the government, and was not acting under an agreement with the government. *Id.* at 253. The court concluded that "[a]s long as the police do nothing to direct or control or involve themselves in the questioning of a person in custody by a private citizen, such questioning does not violate the fifth or sixth amendments." *Id.* at 255. While the case is from the Eighth Circuit, plaintiff does not cite any different law from the Ninth Circuit. In light of *Surridge,* a reasonable officer in Murray's position could have believed that his conduct was lawful given that he did not initiate the questioning, he did not tell Franklin–Lipsker what to ask, and he did not promise Franklin–Lipsker anything in return for her questioning. *See People v. Medina,* 51 Cal.3d 870, 892,

274 Cal.Rptr. 849, 799 P.2d 1282 (1990) (stating that "[n]one of the police agent cases cited by defendant indicates that it would have been improper for the officers to grant an inmate's relatives special visitation privileges in the unspoken hope that they might elicit statements from defendant and inform the officers thereof").

At oral argument plaintiff mused that *Surridge* presents the interesting question of whether a Court of Appeals can "change" the well-established law of the United States Supreme Court. *Surridge* did not change that law; it merely interpreted the "contours" of the law as it applied to the facts of the case, facts that are similar to those presented here. The fact that the Eighth Circuit concluded that Surridge's Sixth Amendment rights had not been violated demonstrates that a reasonable officer in Murray's position could have likewise concluded that his conduct did not violate the Sixth Amendment. Accordingly, Murray is entitled to qualified immunity.

Cuneo is entitled to qualified immunity on the same grounds. Indeed, summary judgment must be granted in Cuneo's favor on the additional ground that no reasonable trier of fact could find that Cuneo violated plaintiff's Sixth Amendment rights given that there is no evidence that he knew the purpose of Franklin–Lipsker's visit or that he even discussed the visit with her, other than to arrange the time and place.

### III. Franklin–Lipsker's Motion

Franklin–Lipsker moves for summary judgment on the first and second causes of action on the grounds (1) that she is entitled to absolute witness immunity, and (2) that she did not conspire with government officials to violate plaintiff's constitutional rights. Plaintiff's opposition does not respond to Franklin–Lipsker's motion for summary judgment.

The first and second causes of action do not seek to hold plaintiff liable for her testimony in court; accordingly, she is not

entitled to absolute witness immunity on those claims. Nevertheless, as plaintiff has not responded to Franklin–Lipsker's motion, it is axiomatic that he has not presented evidence sufficient to permit a trier of fact to find that plaintiff conspired with defendants to (1) arrest plaintiff without probable cause, and (2) to violate his Sixth Amendment right to counsel. Plaintiff is thus entitled to summary judgment on the first and second causes of action.

## CONCLUSION

For the foregoing reasons the Court rules as follows:

1. The motion for summary judgment of Morse and Cassandro is GRANTED on the ground that they are entitled to qualified immunity on plaintiff's claim that they arrested him without probable cause;

2. The motion for summary judgment of Murray and Cuneo is GRANTED and plaintiff's cross-motion for summary judgment is DENIED on the ground that defendants are entitled to qualified immunity on the claim that they violated plaintiff's Sixth Amendment rights; and

3. Franklin–Lipsker's motion for summary judgment is GRANTED.

The only claims remaining in this action are the third and fourth causes of action against Franklin–Lipsker in the Second Amended Complaint. While the arguments Franklin–Lipsker made in support of her motion for summary judgment appear to apply to the third and fourth causes of action, Franklin–Lipsker's motion was directed to the first and second causes of action. Accordingly, the parties are directed to advise the Court in writing by July 28, 2000 as to the status of the remaining claims.

**IT IS SO ORDERED.**